Thank you. Good morning. May it please the court. My name is Phil Brennan, and I represent the appellant in this case, Chadwick Holden. I would like to reserve two minutes of my time for rebuttal. The issue I would like to address this morning is whether the trial court erred in admitting the out-of-court statements of the 911 caller and the victim so as to find a supervised release violations with regards to Violations 2 and 3, which is the assault and the unlawful imprisonment. In discussing this issue, there are really five points involving the facts that are of significance. First, everyone agrees that there was an assault, and that is not in dispute. What is in dispute is who committed the assault. To resolve this question, the court needed to consider the out-of-court statements of either the 911 caller or the victim. Well, this is a revocation of what's supervised release. Correct, Your Honor. So, you don't have exactly the same standards that you would have if, say, this were a jury trial, but you're claiming confrontation and hearsay violations. So, to get past that, essentially, the government has to show good cause, and there's got to be some showing of reliability, right? Correct, Your Honor. Okay. That's the Hall analysis. And what the trial court did was it looked at – it really broke this issue down into two components. It said, first of all, the trial court thought that these statements were not hearsay, which – based on present sense impression and excited utterances. And then, secondly, it said regardless of how you – Well, first of all, we don't have to get to that if we find good cause, do we? Correct, Your Honor. But, on the other hand, even if you're correct and there's no good cause, if it's an exception to the hearsay rule, there's no violation of due process. Well, I think in the – actually, I think in the Hall case, which I realize Judge Toshima was a panelist on, it seemed like there was still a good cause analysis, even – regardless of the characterization, even if it was hearsay or not. I think the government's briefing in a footnote cites the Valdivia case, which talks about the good cause analysis is still appropriate. So let me jump – skip over the hearsay matters and jump right to the Hall balancing. In Hall, of course, the court set forth a number of factors that the court considers in determining whether to consider out-of-court statements. First of all was the importance of the evidence. And in this case, it's my position that the evidence was highly important, because the people that testified at the trial, at the hearing, were the officers who were not there during the alleged assault. It was after the fact. So the testimony was – or the statements were very important. We had two individuals who purportedly saw what happened, the victim and the 911 caller. And both of them, of course, were not there. So I think I can establish this is important. The next question is the indicia of reliability. That one seems to me you have a pretty tough rock to push uphill in this sense, because the 911 caller apparently said he didn't really know them, but he thought that he had seen the woman around somewhere. He – it looked so bad to him, he was, like, really concerned. So he follows them, gets a description of the vehicle, the license plate. He indicates right there, too, that he's – he doesn't really want to get involved. He gives some really strange name, and then they said something. So what does your identification say? And then he comes up with his name. But everything – but what he describes then – he even has a description of what your client was wearing. So then when the officers go there shortly thereafter, you know, voila, the witness, the victim, allegedly, or alleged victim, has all the injuries that he talked about. The green shorts are there. She actually gives – even though she doesn't know this guy – gives a corroborating story. And so the reliability seems pretty – you know, but then, of course, you have the normal recantation later. Correct. And that's the factor that's missing in Comito and it's missing in Hall. We have recantations. So, you know, if you think about due process and bringing the individual into court and facing the accuser, that's, of course, missing in this case. And we have initial statements made by the 911. You seem pretty seasoned. I've watched you for two days. You're a good lawyer, I might add, so you argue well. But it's – you would probably agree with me that it's not uncommon in domestic violent cases to confront a recantation. It is. And I realize that domestic violence is something that's sort of lurking, if not on the side, in the forefront of this case. But, you know, Comito actually talked about an issue which was somewhat similar. Comito left open the issue of when do we not require somebody to come into court because of fear of retaliation or concern. That's essentially what the question was in that case. And maybe this case is addressing that. But, to me, it's still a due process issue. And domestic violence is, of course, something very concerning. But when you have a victim that is repeatedly recanting and is not indicating recently that she doesn't want to come to court because of fear of retaliation or fear of the defendant, but instead because she just doesn't want to come into court for a variety of reasons. She didn't even call the police that day, and she was pretty badly beat up. That's correct. She didn't. The police actually came to her, but she did call the probation officer shortly thereafter and recant. And she did talk to the detective and said, I'll talk with you. I just don't want to be in trial. And that's exactly what the girlfriend in Comito said. You know, the same similar thing. It wasn't a domestic violence case. But she was saying that my boyfriend is the one that had unauthorized use of these credit cards. And then afterwards, she starts contacting or being in contact with the defendant, and she says, I don't want to come to court. And that's essentially what we have in this case. So I understand the concern of domestic violence victims. So what do you think your strongest point is? I think it's getting back to the basic due process rights. And if you have individuals that make these statements on the one hand and later recant them, then I think there's a question of reliability that is missing in this case that existed in Hall. Wait a minute. But there are other indications of reliability, right? In other words, there's some corroboration by the physical facts. Judge Callahan went through some of them. I mean, the officer went to the house. The car was as described, right? The engine was still warm. Went in the house. He saw the green shorts. So there is corroboration. Doesn't that help establish reliability? Well, the corroboration in this case, essentially we have to have both out-of-court statements corroborate each other or feed off each other. Because, again, the question is who did this. And, you know, a warm engine doesn't tell us who did it. In Hall, in the case that Judge DeShima was on, you had corroborating evidence that was actually clearly admissible. You had a witness come in and say, I saw him, I saw the defendant hit this person. You had the defendant himself saying, yes, I hit her once, but I didn't hit her multiple times. In this case, the actual evidence, which I submit is clearly admissible in this case, is not telling us who did it. So I think that's what's missing. So I guess my strongest argument here is that the factual difference in this case from Camito and Hall is that we have a situation where everything is being recanted. And that, again, involves a situation where my client is being essentially convicted. Granted, it's a lower standard. But still, he's being convicted when no eyewitness or no person that actually physically saw what happened is in court. And I think that's a due process violation. Do you want to resurrect the balance? Thank you. Good morning, Your Honor. Good morning, Your Honor. May it please the Court. My name is Andy Colacerto, and I'm representing the United States in this matter. Obviously, the primary question before the Court today is, did the district court violate the defendant's due process rights by admitting hearsay evidence at the supervised release hearing? The answer is no. The district court here employed the proper balancing test that was set forth by this Court in Camito and concluded, based on both the reliability of the witnesses' statements and the government's extensive efforts in trying to secure their presence, that the government's good cause in this case outweighed the defendant's confrontation interests. You know, to me, I have to say this case goes a little bit further than our other cases because there's no eyewitness to the incident. I mean, admissible evidence of that under the rules of evidence. And anybody who saw what happened, everybody recanted. Now, I think Judge Callahan is correct that it's very common in domestic violence cases for the victim to recant. But in this case, you know, what bothers me is we have this third-party witness. Why would he go through all the trouble of, you know, following the car home, right, calling the 911, and then recant unless there was some good reason for a second thought? I mean, there's no indication that he knows the defendant or that he's under the same kind of threat that a victim would be. He's an independent third-party witness. So that recantation bothers me. I think the key there is it was a blanket recantation. I think he expressed his concerns initially about retaliation. And, you know, there's a lot of reluctant witnesses just to get involved. His concern that night was to make sure that that victim was safe, make sure that she didn't suffer any further harm. So he did what he had to do that night to make sure the police got there. He got the license plate. He got the address. He followed them home. Once it's over, she's safe, the defense being handled. He's not so concerned about what's happening to the defendant. And the jeopardy that he may place himself in by going to testify. True, the defendant does not know who he is at this point, but should he go and testify in court, the defendant surely is going to know who he is. And that's where he's concerned. And I think those concerns are alleviated based on the reliability of the statements. All of, if you look at Mr. Barnett's statements, his statements, and he gave three of them initial statements. One was to the 911 operator. Four minutes later, he talks to Officer Riggles and explains the same thing. And then three weeks later, three weeks and a day later, he talks to the detective, Detective Bassett. All of his statements were consistent, both in terms of the description of the events, the injuries, the defendant, the vehicle, everything. His statements were also consistent with the victim's injuries that night. He said that she had a cut on her eye, maybe bleeding from her eye.  That's what you have the opportunity to observe through the photos. He also, his statements were also consistent with the fear that she exhibited that night when she was in the presence of the defendant. In addition to that, his statements were consistent and corroborated by the statement she gave to Officer Moline, both her oral statement out on the porch and the subsequent written statement that was given after the defendant was arrested and taken away from the scene. So, just if I understand your argument, and if I were in your position I would probably argue this, is that it was a pretty violent assault, a banging on the dashboard or whatever that he observed, and that his motivation was not that anyone was punished for it, it's that the woman doesn't get killed and that he doesn't finish it off after that. And after that was over, he has no interest in participating in the criminal justice system. He just didn't want to see the woman get killed and have blood on his hands. Right. And any further efforts on his part would be ones that would ultimately put him in jeopardy if there were to be any repellation. He doesn't know the defendant from Adam. He doesn't know what he's capable of, only what he saw, which was a very violent assault. Now, just a refreshment on what happened to this guy. I know the police tried to follow up with him. Did he disconnect his phone or what? What happened with him is the detective, three weeks and a day after the incident, called and took a recorded statement. At the conclusion of the recorded statement, he had talked about having a subpoena for him and the need for him to come to court. Not coincidentally, the following day, he calls the detective and recants, and his recantation is a blanket recantation saying, I didn't witness anything. The detective then tries to call him later, once he's dealing with other cases, to find out why he's recanting. He says he's in California. This is a week later, the 31st of May. Says he's in California, doesn't have time to talk. He'll call the detective back. Consistent with what he did when he said he'd call off his wriggles back, he doesn't call back. The detective places other calls, leaves messages. He doesn't call back. And eventually, the day before the hearing, when the detective calls, he finds the number's been disconnected. What does the defendant say? The defendant's statements, I think, lend credibility to the statements that both the victim and the witness gave initially and are consistent with those and inconsistent with the subsequent recantations. His statements and the way that they develop is important. In the living room, when he was speaking with Officer Wriggles, the questioning was like this. He asked if he was at the casino. He said he was. He asked if he was with the victim. No. He asked if he was with a female. He said no. He asked how the victim was injured, and he said not. He wasn't sure, and that was something that he had asked her. He then said that he said, well, there was a witness that saw a male assaulting a female, and he denied that it was him and said the witness must be lying. Then at that point is when the other officer came in. He was arrested, and once he was arrested and Mirandized, the officer again questioned him whether he was at the casino. He said no. Then he was advised by the officer that he was going to go to return to the scene and talk to some witnesses. At that point in time, the defendant changed his story and said that he was. Just like all the witnesses. He said that he was with the victim, that they were arguing. He didn't assault her, but they were arguing. The argument was because he was trying to find out who assaulted her, but had no idea who assaulted her. Then later in a statement, the only statement that he made to Officer Moline, he attributed the assault to an unknown black male. So if you look at his statements, if this was truly a situation where she was assaulted by someone else and he was frustrated about not being able to find out, why wouldn't he express concern for her well-being? Why wouldn't he express concern about who did this initially with the officers? He doesn't. He denies being with her. He denies having a conversation with her about it. When does the story come up about that, about the woman that the quote-unquote victim was assaulted by two women? That came from the victim herself. And that's the other thing. In addition to all the reasons why these statements are reliable and the consistency of them, the cross-corroboration and the consistency with the evidence that was found at the scene and the accuracy of the descriptions, including the defendant, is that the recantations are not credible. And so they don't affect the reliability. Again, the witnesses was a blanket recantation. The victim gave multiple detailed recantations that were inconsistent with one another. With respect to those inconsistencies, she originally told the probation officer, which was a week after the event, that she was assaulted by two females at the casino. Later, to the defense investigator, she said she was assaulted by one female at a separate location. In addition, to the probation officer, she originally said, yes, she said what she said to the police, but she was pressured into making that statement. Later, she pulled and left a message, you can see in his chrono entry, saying that she didn't write everything that was in that statement. Well, that was directly refuted by the officer's testimony that she wrote everything in her written statement. It was even a question asked by the district court. So the court heard not only the inculpatory hearsay statements, but the exculpatory hearsay statements. Which I think tends to reduce the defendant's confrontation interest in light of the fact that we put everything out there on the table. There wasn't anything that the court didn't hear. The court heard the whole story and was able to make the credibility call based on the totality of the evidence. Getting back to her recantation to the defense investigator, she told the defense investigator that she originally told the police that she injured herself as she was trying to assault the defendant, and that she may have hit her face on the dash. And she said that she told the officers over and over that the defendant did not do it. The defendant did not hit her. And that she made up these statements about the defendant assaulting her once she realized that someone was going to jail. Were there any prior domestic violence reports between the two of them? Yes, as indicated in testified to by Detective Bassett, there was an incident that occurred in August of 2010 where she left a note with a clerk indicating that someone is trying to kill me and left an address very similar. It was the same address as this case and very similar to our situation here when the officers arrived at the door. Who were they greeted by? The victim and the defendant. And the victim did have noticeable scratches on her neck which made the officer concerned, but she denied that anything had taken place. So again, she tells the defense investigator in her recantation that the defendant has not hit her. And that she told that to the officers where the officers say that she provided one consistent version, and that version was that the defendant had assaulted her. And that version was consistent with the fear of the defendant that she expressed and exhibited in their presence that night. The other thing that the district court, I think, brought up was... You need to wrap up. You're going into overtime. ...to believe the recantations would lead to the ridiculous conclusion that these two somehow, she was assaulted by someone else and they conspired to pin this assault on the defendant. Thank you. Just picking up on the last question Judge Callahan asked, were there prior domestic violences between the two? I think the prosecutor's answer was half right. I think the evidence was from Detective Barnett was that there was a call from the AM-PM type of gas station by the defendant, but there was no... My recollection is there's no specifically naming Mr. Holden as the individual. A call by the victim, not by the defendant. I'm sorry. That's right. With regard to Judge Tashima's questioning about the recantation by the 911 caller, there's this whole question I have about... He says, I guess, the presentation of the government is, well, this guy's in fear and he doesn't want to come into court. And I think that's not enough. I think that the case's committee says, you need more than that. Just simply saying you're fearful, where's the evidence of that? And as Judge Callahan says, he's already initially been involved in the system by calling 911. He just doesn't want to follow through. And again, that comes back to my due process concerns for my client. In a criminal trial, which I realize this is different, you're going to have witnesses. You're going to face your accusers. And my client's got 24 months in prison right now, and he didn't face his accusers, and I think that's a problem. The last thing I'd like to say is just, where does this leave us? I think Judge Tashima is right. This case is carrying us further than the other cases are. And the concern I have is that in supervised release violation hearings, the message for the government is, just bring in the officers. Because you're going to be able to piece together indicia, based on the government's approach, at least their view, and you're really not going to need eyewitnesses anymore. And the question I have is, do we reach a point where the due process rights are so limited and so reduced in a supervised release violation hearing, where what we typically see, which is an eyewitness, I saw this, this is what happened, doesn't even have to come into court. And instead, we just hear it through the police officer's mouth, particularly with witnesses that have either recanted and or have shown some percentage of reliability that is less than what we would expect. So my concern is that this case sets a dangerous precedent, and I would ask that the court reverse. Thank you. Thank you both for your arguments. This matter stands submitted. I do want to compliment both of you on your argument. I had an opportunity to see you yesterday as well, Mr. Brennan. And, you know, I know that it pleases all of us to know that neither of you have clients that get to pick you. And I know that we don't pay you a lot, but it's very satisfying to see people, you know, representing interests at the level and the preparedness that you both have done. Thank you.
judges: Hug, Tashima, Callahan